## UNITED STATES v. SHEFFIELD FARMS CO., Inc., et al.

District Court, S. D. New York.

Feb. 4, 1942.

2

Thurman Arnold, Asst. Atty. Gen., and George S. Robinson, Maurice L. A. Gellis, and G. Joseph Minetti, Sp. Assts. to the Atty. Gen.

Sullivan & Cromwell and Alger, Peck, Andrew & Rohlfs, all of New York City (David W. Peck, Arthur J. Peck, and John R. Raben, all of New York City, of counsel), for Sheffield Farms Company, Inc., and others.

Milbank, Tweed & Hope, of New York City (John A. Kelly, Henry Kirk Greer, and Austen B. McGregor, all of New York City, of counsel), for Borden Co. and others.

Rubinton & Coleman, of Brooklyn, N. Y., for Frohman Holland.

Albert Lyons, of Brooklyn, N. Y., for Frank E. Smith.

GODDARD, District Judge.

Defendants have been indicted for an alleged violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1, the charge being that, together with other individuals, associations, firms and corporations, they continuously engaged in a wrongful and unlawful conspiracy in restraint of interstate commerce in the wholesale distribution of fluid milk in the City of New York, said milk having been shipped in to said city from the States of New York, New Jersey, Pennsylvania, Vermont, Massachusetts and Connecticut.

To this indictment defendants have entered a plea in abatement and a demurrer. The Government has filed a demurrer to the plea in abatement and moved to strike said plea.

As to the plea in abatement, it is claimed by defendants that the indictment must be abated because

1. "this criminal suit or action is brought, instituted and commenced by George S. Robinson, Maurice L. A. Gellis and G. Joseph Minetti, Special Assistants to the Attorney General of the United States (acting pursuant to purported authority and the direction of said Attorney General contained in letters of appointment issued by him)" and

2. "this suit or action was not brought, instituted or commenced by the United States Attorney for the Southern District of New York".

Defendants contend that letters of authority to the three special assistants to the Attorney General, retaining them and directing that they proceed, exceeded the authority of the Attorney General, asserting that no right exists in that official to commence criminal proceedings; and that only the United States District Attorney has such power. It is further contended that since the indictment was not signed by the United States District Attorney, but by the three special assistants above named the indictment is invalid.

On March 10, 1941, the Attorney General, by his assistant, wrote to the three special assistants retaining them and directing that they proceed against the defendants and others for violations of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, and Clayton Act, 38 Stat. 730.

The Grand Jury was originally empaneled by my order of March 12, 1941, upon the certificate of John T. Cahill, then United States Attorney for the Southern District of New York. On March 28, 1941, by order of Judge Knox, upon the certificate of Mathias F. Correa, successor to Mr. Cahill as United States Attorney for the Southern District of New York, the March, 1941, Term of the Grand Jury was continued and extended to the April, 1941, Term of the court, and on May 1, 1941, upon the certificate of Mr. Correa, Judge Knox continued and extended the March, 1941, Term of the Grand Jury to the May, 1941, Term of this court.

The letter of March 10, 1941, from the Attorney General retaining the special assistants in this case read, insofar as it is here pertinent: "You are hereby expressly authorized to commence prosecution under these statutes against the above-named parties and such other parties as may have participated in the violation of such statutes."

Chapter 3935 of 34 Stat. 816, 5 U.S.C.A. § 310, provides: *"Conduct of legal proceedings.* The Attorney General or any

officer of the Department of Justice, or any attorney or counselor specially appointed by the Attorney General under any provision of law, may, when thereunto specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before criminal magistrates, which district attorneys may be by law authorized to conduct, whether or not he or they be residents of the district in which such proceeding is brought".

The defendants contend that the authorization from the Attorney General to the special assistants was "to commence legal proceedings * * *", whereas Section 310 authorizes the "conduct of legal proceedings"; thus it is urged that the special assistants lacked authority to commence legal proceedings.

I think that the plain intent of Section 310 was to authorize the Attorney General or his special assistants to commence and conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings, which district attorneys are by law authorized to conduct. Section 310 itself provides that the special assistants to the Attorney General shall have the same power as the United States District Attorney when specifically authorized by the Attorney General, and 28 U.S.C.A. § 485 authorizes the United States District Attorney to prosecute crimes in violation of the laws of the United States.

An examination of the legislative history of Section 310 indicates that its passage in June, 1906, resulted from the decision in United States v. Rosenthal, 121 F. 862, decided on March 17, 1903, by the Circuit Court, S.D.,N.Y., which held that neither the Attorney General, nor his special assistants, nor any officer of the Department of Justice were authorized to conduct or aid in the conduct of proceedings before a Grand Jury, and that only the United States District Attorney had such authority. (See House Report No. 2901, 59th Congress, 1st Session). Mr. Gillette, in the House Report, said:

"The purpose of this bill is to give to the Attorney General or to any officer in this Department or to any attorney specially employed by him, the same rights, powers and authority which district attorneys now have or may hereafter have in presenting and conducting proceedings before a grand jury * * *".

"The Attorney General states that it is necessary * * * that he shall be permitted to employ special counsel to assist the district attorney * * * in cases of unusual importance to the Government, and that such counsel be permitted to possess all of the power and authority, in that particular case, granted to the district attorney which, of course, includes his right to appear before a grand jury either with the district attorney or alone.

"It seems eminently proper that such power and authority be given by law. It has been the practice to do so in the past and it will be necessary that this practice shall continue in the future".

I do not think that the Attorney General exceeded his statutory power in authorizing his special assistants to proceed against the defendants, and I interpret Section 310 as conferring authority upon the special assistants to the Attorney General, coextensive with that of the United States Attorney in cases where the Attorney General has specifically authorized it. Counsel for the defendants have failed to show me any authority interpreting Section 310 to the contrary.

The absence of the signature of the United States Attorney upon the indictment is only a matter of form (it being no part of the indictment) which does not go to the substance of the indictment, and not being prejudicial to the defendants, will not be considered. 18 U.S.C.A. § 556; see, also, United States v. McAvoy, C.C.N.Y., Fed.Cas.No.15,654.

Accordingly, the Government's demurrer is sustained and the plea in abatement is stricken out.

Defendants demur to the indictment upon the ground that it does not state facts constituting a combination or conspiracy in restraint of interstate commerce and the conspiracy alleged is not in restraint of interstate trade or commerce. These objections are based upon the theory that any alleged price pegging which took place was solely a local matter and not within the purview of the Sherman Act, which is aimed only at interstate restraints.

The indictment alleges in substance that the defendants purchased milk outside of the State of New York, to wit, from New Jersey, Pennsylvania, Vermont, Massachusetts and Connecticut, which they commingled with milk produced in New York State. It is then charged that the

defendants "entered into a combination and conspiracy unreasonably to raise, fix and maintain wholesale prices for the distribution and sale in the City of New York of milk produced in the States of New York, New Jersey, Pennsylvania, Vermont, Massachusetts and Connecticut and shipped from said States in interstate commerce into said City * * *".

In support of these charges, the indictment sets forth various conferences between the defendants in New York City, wherein it was agreed that certain prices should be charged. It is then charged that "increases in the wholesale prices charged by distributors were generally followed by similar increases in the prices paid by consumers for milk purchased in stores and had the effect of reducing the volume of milk purchased by the consuming public, thus reducing the quantity of milk transported and shipped into the City of New York from the States of New York, New Jersey, Pennsylvania, Vermont, Massachusetts and Connecticut".

The defendants contend that the conspiracy alleged operated solely with respect to the prices charged for milk at wholesale in the City of New York after the milk had come to rest in city plants and after any milk which originated outside the state was intermingled with local milk, pasteurized and packaged. However, the milk could not have been sold in New York City if it had not been pasteurized because of a local ordinance, and the packaging is but a necessary incident to its distribution.

■ Agreements fixing the prices of articles moving in interstate commerce are unlawful per se under the Sherman Act because they eliminate competition. United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; United States v. Socony Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. Thus, the question to be determined is whether the indictment sufficiently charges a combination or conspiracy affecting interstate commerce.

■ ■ It is now settled law that the Congress can, by virtue of its power over interstate commerce, regulate local or intrastate matters which burden that commerce. Local 167 v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804; N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Virginian Ry. Co. v. Federation System, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789. Defendants argue that while the Congress has this power, it has not seen fit to exercise it under the Sherman Act. This contention of the defendants is clearly refuted by the decision in Local 167 v. United States, 291 U.S. 293, 54 S.Ct. 396, 398, 78 L.Ed. 804 (a Sherman Act case):

"But we need not decide when interstate commerce ends and that which is intrastate begins. The control of the handling, the sales and the prices at the place of origin before the interstate journey begins or in the state of destination where the interstate movement ends may operate directly to restrain and monopolize interstate commerce. United States v. Brim, 272 U.S. 549, 47 S.Ct. 169, 71 L.Ed. 403; Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 310, 45 S.Ct. 551, 69 L. Ed. 963; United States v. Swift & Co., C. C., 122 F. 529, 532, 533. * * * The Sherman Act denounces every conspiracy in restraint of trade including those that are to be carried on by acts constituting intrastate transactions. Bedford Cut Stone Co. v. Journeymen Stone Cutters' Ass'n, 274 U.S. 37, 46, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791; Loewe v. Lawlor, 208 U.S. 274, 401, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815. [291 U.S. at page 297, 54 S.Ct. at page 398, 78 L.Ed. 804]

* * * * * *

"But intrastate acts will be enjoined whenever necessary or appropriate for the protection of interstate commerce against any restraint denounced by the act. * * *" 291 U.S. at pages 299, 300, 54 S.Ct. at page 399, 78 L.Ed. 804.

See, also, Apex Hosiery Co. v. Leader et al., 310 U.S. 469, 60 S.Ct. 982, 84 L. Ed. 1311, 128 A.L.R. 1044.[1]

---

[1] "In seeking more effective protection of the public from the growing evils of restraints on the competitive system effected by the concentrated commercial power of 'trusts' and 'combinations' at the close of the nineteenth century, the legislators found ready at their hand the common law concept of illegal restraints of trade or commerce. In enacting the Sherman law they took over that concept by condemning such restraints wherever they occur in or affect commerce between the states". 310 U.S. at pages 497, 498, 60 S.Ct. at page 994, 84 L.Ed. 1311, 128 A. L.R. 1044.

The foregoing language makes it clear that in the judgment of the Supreme Court the general rules applicable to intrastate burdens upon interstate commerce will be applied to the Sherman Act; and the Sherman Act is applicable to intrastate activities which burden interstate commerce.

The temporary stoppage of commerce on its way to the ultimate consumer does not remove the flow from the jurisdiction of the Federal Government. United States v. General Motors, 7 Cir., 121 F. 2d 376, certiorari denied October 13, 1941, 62 S.Ct. 105, 86 L.Ed. ——; Schechter Poultry Corp. v. United States, 295 U.S. 495, 544, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947; Local 167 v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804; N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. Therefore the stoppage of the milk, coming across state lines, for the purpose of pasteurization and packaging or bottling, did not change its interstate character. Local 167 v. United States, supra.

I think the indictment is sufficient. Accordingly the Government's demurrer to the defendants' plea in abatement is sustained, the plea in abatement is stricken, and the defendants' demurrer to the indictment is overruled.